IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SPRINT COMMUNICATIONS, L.P., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 11-2683-JAR-KMH** |
| | ) | |
| COX COMMUNICATIONS, INC., | ) | |
| COX COMMUNICATIONS KANSAS, | ) | |
| LLC, COX KANSAS TELCOM, LLC, | ) | |
| and, COXCOM, LLC., | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**MEMORANDUM AND ORDER**

Before the Court is Defendant Cox Communications Inc.'s ("CCI") Motion to Dismiss
under Rule 12(b)(2) and 12(b)(3) for Lack of Personal Jurisdiction and Improper Venue (Doc.
31) and Defendants CCI, Cox Communications Kansas, LLC, Cox Kansas Telcom, LLC, and
CoxCom, LLC's Motion to Transfer (Doc. 33).  The Court granted Sprint's request to conduct
jurisdictional discovery and the Court held an evidentiary hearing on August 9, 2012.  The Court
has considered the briefs, as well as the evidence submitted with the briefs and at the evidentiary
hearing, and is prepared to rule.  As described more fully below, the Court finds CCI is not
subject to personal jurisdiction, but rather than grant the motion to dismiss, the Court grants
Defendants' motion to transfer this case to the United States District Court for the District of
Delaware.

I.      **Background**

Plaintiff Sprint Communications Company L.P. ("Sprint") is a telecommunications
company incorporated in Delaware with its principal place of business in Overland Park, Kansas.
Among its patent portfolio is a series of patents relating to voice-over-packet ("VoP")

telecommunications technology.  Sprint alleges in the Amended Complaint that Defendants made, used, offered to sell, and/or sold (and continue to make, use, offer to sell, and/or sell) broadband and/or packet-based telephony products and services that infringe Sprint's Asserted Patents without Sprint's permission.

On April 16, 2012, Defendants filed a declaratory judgment action for noninfringement in the United States District Court for the District of Delaware, along with several other Cox entities not named in this suit.  Sprint notified this Court that on July 9, 2012, it filed a motion to sever and transfer the declaratory judgment action from Delaware to this Court (Doc. 45).  CCI contends that it is not amenable to suit in the District of Kansas and that any adjudication of patent infringement by the Cox companies must include CCI and therefore should be consolidated in one action in the District of Delaware, where all of the Cox entities, including CCI and the Cox subsidiaries not named in this action, are subject to suit.

It is uncontroverted that CCI is incorporated in Delaware and maintains its principal place of business in Atlanta, Georgia.  All Defendants are incorporated in Delaware.  CCI is a subsidiary of Cox Enterprises, Inc. and acts as a holding company, providing certain corporate services to the Cox subsidiaries in the communications industry.  Cox Enterprises, Inc. is not a party to this action.  CCI in turn owns Co-Defendant CoxCom but does not directly own or finance Co-Defendants Cox Kansas Telcom or Cox Communications Kansas.  CCI is not registered to do business in Kansas and it does not maintain an office here.  CCI is a separate legal entity from the other Defendants.  CCI concedes that it hosts the cox.com website and that it owns all copyrights, trade and service marks, and patents for its affiliates.  CCI also admits that it provides a marketing platform and administrative infrastructure to Cox Kansas Telcom and

Cox Communications Kansas, providing "back office functions" for all of its subsidiaries.

***Sprint's Jurisdictional Evidence***

Sprint alleges the following jurisdictional facts in the Amended Complaint to support its contention that CCI is subject to specific jurisdiction: (1) CCI makes, uses, or offers for sale infringing products and/or services in Kansas, including the "Cox Digital Telephone," Cox's "SIP Trunking" service, and "other related telephony services"; (2) CCI receives revenues from the sale of telephony services in Kansas, including those services offered for sale by the Cox subsidiaries; (3) CCI is the registered owner of the "cox.com" domain, which hosts Cox websites that advertise, market, sell, and offer to sell the allegedly infringing products or services in Kansas; (4) one of the Kansas subsidiaries' websites includes a copyright notice identifying CCI as the owner of the copyrighted website; (5) current or former employees of CCI participated in the design, development, funding, testing, and use of Cox's nationwide telephone network; (6) CCI directs, controls, and issues Cox's nationwide telephony tariffing, including tariffs submitted by CCI and the Kansas subsidiaries to Kansas regulatory authorities; (7) CCI instructs users of its telephony services in Kansas on how to use the network in an infringing manner; (8) and CCI leads, manages, and controls the marketing and advertising efforts of the allegedly infringing products to Kansas residents.

Sprint has also submitted evidence on the briefs to support this Court's jurisdiction. First, Sprint submits the declaration of Bruce McLeod, who is the Executive Director of Service and Enterprise Architecture for CCI.[1]  His declaration was filed in support of a successful motion to transfer filed by CCI in a different patent infringement case in the Eastern District of

---

[1] The Court agrees with Sprint that the McLeod Declaration was properly submitted as an exhibit attached to Sprint's brief, and the Court considers it in deciding this motion.

3

Virginia.[2] Like this case, *Bear Creek* alleged claims of patent infringement related to VoP

enabling technologies.  Cox moved to transfer to the Northern District of Georgia, citing its ties

to Atlanta, Georgia and both sides' lack of ties to the Eastern District of Virginia.  McLeod

declared in support of that motion:

> The Cox telephony system was designed and is managed on the
> national level.  In each region of operation, Cox offers its
> telephony service to customers through local affiliates that operate
> in each local market Cox serves.  Similar to a hub and spoke
> system, Cox operates as the hub in Atlanta, Georgia, connecting to
> all of its local affiliates, which are the spokes.  All of the research,
> design, and development work to implement Cox's telephony
> system have been handled at the hub level in Atlanta, Georgia, not
> at the local level (such as Virginia).  The local affiliates (the
> spokes) merely provide local marketing, sales, installation and
> repair work in each local market.[3]

McLeod also asserts that "Cox's Digital Telephone service was developed and designed by Cox

employees located at Cox's headquarters in Atlanta, Georgia"[4] and that "Cox coordinates the

nationwide sale, marketing, and financial operations of the Cox Digital Telephone service at its

business offices in Atlanta, Georgia."[5]

Sprint alleges that CCI's website advertises and markets products and services to Kansas

residents, allowing them to purchase products and services that include the Cox Digital

Telephone.[6]  The Cox Customer Service Agreement, available through the cox.com website,

---

[2]The Court takes judicial notice of the docket sheet and filings in *Bear Creek Techs., Inc. v. Cox Commc'ns, Inc.*, Case. No. 111-00879-CMH  (E.D. Va.).

[3]Doc. 38, Ex. A-1 ¶ 5.

[4]*Id.* ¶ 6.

[5]*Id.* ¶ 11.

[6]Doc. 38, Ex. A-5.

identifies the parties to the agreement as the customer and "Cox," which it defines as "Cox Communications and any Cox affiliate authorized to provide you with our services."

Sprint has submitted three white papers regarding Cox's transition to a VoP architecture and its network configurations issued by "Cox Communications."[7]  They highlight Cox's centralized operations.

Plaintiff submitted evidence on the briefs and at the hearing that CCI owns equipment in Kansas that is used in Cox's telecommunications system.  This evidence consists of Sedgwick County-created tax records.[8]  These records show that CCI pays personal property and real estate taxes in Kansas for Cox business property.[9]  The personal property tax statements are signed by CCI's tax manager in the "Owner" signature block.

Sprint also submits evidence that "Cox Communications" has employees in Kansas, including executives,[10] that it posts jobs on its website to be performed in Kansas,[11] and that CCI has applied to the Kansas Corporation Commission for tariffs.[12]

### CCI's Jurisdictional Evidence

At the August 13th hearing, Robin Sangston, Esq., the Vice President and Chief Compliance Officer for CCI in Atlanta, Georgia, testified about the issues related to the motion to dismiss, including Cox's corporate organization and CCI's contacts with the State of Kansas.

---

[7]Doc. 38, Ex. A-2.

[8]Doc. 38, Ex. A-3.

[9]Hrg. Pl. Ex. I, J; Doc. 38, Ex. A-4.

[10]Doc. 38, Ex. A-7.

[11]Doc. 38, Ex. A-8.

[12]Doc. 38, Ex. A-9.

Sangston testified that the Cox family consists of seventy separate franchises with CoxCom as the operating business.  Cox made a deliberate decision to form "drop down subsidiaries" to hold the telecommunications licenses so that the parent corporations are not engaged in the day-to-day operation of cable business.

Cox Communications Kansas manages the network and has a shared services agreement with Cox Kansas Telcom to provide cable services.  Accordingly, Sangston testified that CCI conducts no business in Kansas, either directly or through a d/b/a.  CCI neither owns nor operates any telecommunications or cable systems.  Sangston also testified that a certificate of public convenience and necessity is required in each state to authorize a provider to sell telephone services to the public.  Typically, a franchise applies to the Secretary of State's office and must show that the entity is financially, technically, and managerially capable of providing that service.  Sangston testified that Cox's certificate in Kansas was granted largely to have phone offering competitive to Southwestern Bell and Sprint.  Kansas requires that Cox submit tariffs that lay out prices and terms of sale; they are filed under the name "Cox Communications Kansas, LLC."  Kansas Telcom has interconnection agreements with Sprint and Southwestern Bell to permit the traffic of Cox customers to ride over their networks.

Sangston testified that Cox Communications Kansas owns the equipment and property used in Kansas and that it employs all 400 of the Kansas employees.  Sangston addressed the Personal Property and Asset Detail Listing that Sprint relied on in its motion, showing that CCI is the owner of certain equipment used to provide digital telephone services. She spoke to an individual in CCI's tax department, who explained that it received this document from Sedgwick County and that the indication on that form that CCI owns the property is

incorrect; she attributes the error to the fact that the taxing authority receives checks from CCI. Sangston testified that Cox Communications Kansas actually owns this property, based on CCI's internal documents and ledgers.  CCI submitted Exhibit 2 at the hearing, which is the general ledger for Cox Communications Kansas, showing that it is the corporate entity responsible for paying taxes on equipment.  Sangston maintains that CCI owns no personal property in Kansas.

Sangston responded to Sprint's evidence that Sedgwick County considers CCI to be the owner of certain real property in the County.  She testified that the tax statement submitted by Sprint pertains to an office building in Wichita, Kansas that CoxCom acquired in 2000.  She testified that the owner's name on this statement is incorrect.  Exhibit 4 produced by CCI at the hearing is the warranty deed supporting this testimony and the title records confirm that Cox Communications Kansas currently owns the property.

Sangston further testified that CCI conducts all "back office" functions for the Cox Com subsidiaries, including issuing tax checks.  CCI issues the checks and the funds are then charged back to the applicable subsidiary.  The charge is reflected on the financial statements of the subsidiary.  She testified that no income from the Kansas subsidiaries flows up to CCI.  She explained that it would be too cumbersome to have twenty-four different financial statements, so Cox rolls up the local market revenues for purposes of preparing the financial statements, but then they are charged back.  She stated that the revenues actually do "hit" Cox Com, but only for purposes of preparing the consolidated "look" for reporting purposes.  CCI submitted the consolidated Kansas corporate income tax return for Cox Enterprises, Inc. and its subsidiaries.[13] Sangston explained that the parent company completes a consolidated return and then each

---

[13]Hrg. Def. Ex. 6.

separate entity charges back the tax.  The return for 2010 shows no reportable income and no

corporate income tax owed for CCI in Kansas in 2010.

 Cox Communications Kansas employs about 400 individuals and has a completely

separate management team from CCI; it pays its own employees.

With respect to telephony equipment, Sangston testified that CCI provides a

"consultative and supply line service."  She explained that the local markets must purchase and

pay for their own equipment, relying on a consultative role provided by CCI.  She explained that

certain purchases may allow for a volume discount, in which case CCI may buy in volume and

allow the subsidiaries to purchase from that inventory.

CCI provides technical and engineering support to the subsidiaries.  Like McLeod,

Sangston characterized the relationship between CCI and the local affiliates as a "hub and

spoke" system with respect to the design and architecture of the telephone system.  Local teams

of technicians are the spokes that draw support from the hub in Atlanta.  Cox Communications

Kansas employs a regional Vice President of Field Operations, who along with a 100-person

team, is responsible for installing, maintaining, and servicing equipment in the region.  There is a

regional operations center (the "ROC") in Oklahoma that is able to determine network problems

on a regional scale and notify the Vice President of Field Operations and his team.  CCI also has

a network operations center (the "NOC"), consisting of CCI employees in Atlanta, that provides

service if there is a network problem that exceeds a regional scope.  The NOC "looks out" on the

Cox network and notifies local teams about network problems such as congestion, or hacking

issues that local technicians would not be able to identify as readily.

Sangston testified about the marketing structure between the Cox entities.  She testified

about local marketing efforts that are required based on the different competitors in the various local markets.  These efforts include customer care centers, retail solution stores, call center phone numbers, door to door sales, and e-commerce marketing strategies.  The marketing team in Kansas is supported by a corporate marketing and sales department in Atlanta that devises national campaigns available to the local markets.

The cox.com website is owned by CCI.  CCI also helps with the development of cox.com templates and sets up the home page for the cox.com site.  The cox.com site is managed by CCI employees, but the local markets each have their own webmaster that supplies sales and marketing content for the local page.  Kansas customers may purchase Cox digital telephone services through the cox.com website by navigating to the local webpage.  The Kansas webpage is directed to Kansas residents and there are separate webpages for each of the particular cities in Kansas that offer Cox services.  Each local page allows customers to buy, modify an existing account, or create a new account.  Purchase information is housed in a Kansas database and the order is fulfilled by local Kansas employees.  Kansas customers' bills are generated by a central invoicing process by CCI, but payments are made to the local Kansas affiliate.

## II.     Personal Jurisdiction

### A.      Standard

Because this is a patent infringement suit, the Court must apply the law of the Federal Circuit in deciding the jurisdictional issue.[14]  Plaintiff may demonstrate personal jurisdiction over an out-of-state defendant if "the relevant state's long-arm statute permits the assertion of

---

[14]*See Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1328 (Fed. Cir. 2008); *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1230 (Fed. Cir. 2010).

jurisdiction without violating federal due process."[15]  The Kansas long-arm statute is construed

liberally so as to allow jurisdiction to the full extent permitted by due process, therefore the

Court proceeds directly to the constitutional analysis.[16]  For the court's exercise of jurisdiction to

comport with due process, the defendant must have "minimum contacts" with the State of

Kansas, "such that having to defend a lawsuit there would not 'offend traditional notions of fair

play and substantial justice.'"[17]  "Minimum contacts" can be established in one of two ways,

either generally or specifically for lawsuits based on the forum-related activities:

> General jurisdiction is based on an out-of-state defendant's
> "continuous and systematic" contacts with the forum state, and
> does not require that the claim be related to those contacts.
> Specific jurisdiction, on the other hand, is premised on something
> of a quid pro quo: in exchange for "benefitting" from some
> purposive conduct directed at the forum state, a party is deemed to
> consent to the exercise of jurisdiction for claims related to those
> contacts.[18]

Here, Sprint did not assert in its response brief that this Court has general jurisdiction; instead it

argued that the Court has specific jurisdiction over CCI.  At the hearing, Sprint argued that

general jurisdiction is "alive and kicking," because certain evidence discovered since briefing

calls into question CCI's jurisdictional contentions at the time the motion to dismiss was filed.

## B.    Discussion

CCI argues in its motion to dismiss that Sprint is unable to establish it is subject to

---

[15]*Nuance Commcn's, Inc.*, 626 F.3d at 1230.

[16]*Fed. Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994) (citing *Volt Delta Res., Inc. v. Devine*, 740 P.2d 1089, 1092 (Kan. 1987)).

[17]*Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[18]*Id.* at 1078.

personal jurisdiction in Kansas.  CCI urges it is merely the grandparent corporation to Cox

Communications Kansas and Cox Kansas Telcom, performing only administrative and support

functions to those affiliates in Kansas.  It further argues that none of the Kansas activities cited

by Sprint arise out of or relate to the patent infringement claims in this case—Sprint is unable to

show that CCI's activities in Kansas are related to making, using, selling, or offering for sale the

allegedly infringing VoP products or services.  Sprint argues that CCI purposefully directed its

activities at residents of Kansas through the cox.com website, its interaction with the Kansas

subsidiaries, and by activities such as paying taxes in Kansas, sending invoices to Kansas

customers, and maintaining the Cox Digital Telephone network.

General jurisdiction exists over a nonresident defendant whose contacts with the state are

"continuous and systematic."[19]  General jurisdiction is conferred by these activities even when

the cause of action has no relationship with those contacts."[20]  With respect to specific

jurisdiction, the Federal Circuit applies the following test to determine if specific jurisdiction

exists: (1) whether the defendant purposefully directed activities at residents of the forum; (2)

whether the claim arises out of or relates to those activities; and (3) whether assertion of personal

jurisdiction is reasonable and fair.[21]  One way a defendant can be subject to specific jurisdiction

is "by sending its goods rather than its agents . . . where the defendant can be said to have

targeted the forum; as a general rule, it is not enough that the defendant might have predicted

---

[19]*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).

[20]*Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1200 (Fed. Cir. 2003).

[21]*E.g.*, *Avocent Huntsville Corp.*, 552 F.3d at 1332; *Nuance Commc'n's, Inc.*, 626 F.3d at 1231.

11

that its good will reach the forum State."[22]  Under this "stream of commerce theory," the Court must determine whether the defendant "has followed a course of conduct directed at the society or economy existing within the given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct."[23]

While Sprint resurrected general jurisdiction at the hearing, it spent little time developing an argument about how CCI is subject to general jurisdiction either at the hearing or in its posthearing brief.  The Court will briefly address general jurisdiction in conjunction with its minimum contacts analysis.  Since the Court allowed jurisdictional discovery and conducted an evidentiary hearing, Sprint bears the burden of proving personal jurisdiction exists by a preponderance of the evidence.[24]

### 1.      CCI's Contacts with Kansas

Sprint points to several activities it contends CCI purposefully directed at residents of Kansas, including collecting revenue, hosting the Cox website, designing and marketing the Cox network, owning property, paying taxes, and filing corporate and regulatory filings on behalf of the Cox subsidiaries in Kansas.  CCI contends that it is not licensed to do business in Kansas and it does not sell or offer to sell any allegedly infringing product; such activity is performed by the Kansas subsidiaries.  CCI insists that it is a separate legal entity and that its support of the other named defendants amounts to nothing more than administrative, technical, and legal functions.  Sprint responds that CCI exerts control over the subsidiaries and collects revenue on their behalf.

---

[22]*J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2788 (2011).

[23]*Id.* at 2789.

[24]*See Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1334 (Fed. Cir. 2001); *Wempe v. Sunrise Med. HHG, Inc.*, 61 F. Supp. 2d 1165, 1167 (D. Kan. 1999).

The Court conducted a hearing on this motion primarily because CCI's role in Cox's corporate organization and degree of control over the Kansas subsidiaries appeared to be in dispute based on the allegations in the Amended Complaint and the evidence submitted on the briefs.  The Court resolves these conflicts as described more fully below and finds that Sprint is unable to show by a preponderance of the evidence that CCI has sufficient contacts with Kansas under either a general or specific jurisdictional inquiry.

    *a.*       *CCI's Interaction with its Subsidiaries*

The Court begins its analysis with the well-settled proposition that a "holding or parent company has a separate corporate existence from its subsidiary and is thus treated separately in the absence of circumstances justifying the disregard of the corporate entity."[25]  Sprint does not rely on an alter ego theory for subjecting CCI to jurisdiction,[26] but instead argues that CCI controls the actions of its subsidiaries, including those in Kansas, by taking part in the design, development, funding and testing of Cox's nationwide phone network and by managing and directing the marketing and advertising for Cox's telephony products and services.  CCI contends that it is a mere holding company and does not sell or use any of the products and services at issue in the patent claims—those are sold exclusively through the Kansas subsidiaries.

Sprint cites *Dainippon Screen Manufacturing Co. v. CFMT, Inc.*, for the proposition that a patent holding company cannot be insulated from suit when it engages in activities sufficient to

---

[25]*Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974).

[26]*See Cotracom Commodity Trading AG v. Seaboard Corp.*, 94 F. Supp. 2d 1189, 1195 (D. Kan. 2000) (evaluating whether the defendant is subject to jurisdiction under an alter ego theory).

create personal jurisdiction.[27]  In *Dainippon*, agents of the holding company issued threats of infringement, licensed another defendant to make, use, and sell products covered by the patent at issue, and maintained sales agents in the forum state to fulfill that purpose.[28]  In addition, the holding company derived substantial revenues and attempted to negotiate a sublicense with the plaintiff.[29]  With respect to the parent-subsidiary relationship, the court explained:

> Stripped to its essentials, CFM contends that a parent company can incorporate a holding company in another state, transfer its patents to the holding company, arrange to have those patents licensed back to itself by virtue of its complete control over the holding company, and threaten its competitors with infringement without fear of being a declaratory judgment defendant, save perhaps in the state of incorporation of the holding company.  This argument qualifies for one of our "chutzpah" awards.  While a patent holding subsidiary is a legitimate creature and may provide certain business advantages, it cannot fairly be used to insulate patent owners from defending declaratory judgment actions in those fora where its parent company operates under the patent and engages in activities sufficient to create personal jurisdiction and declaratory judgment jurisdiction.  After considering all of the relevant factors, we conclude that the court erred in holding that it lacked personal jurisdiction over defendant CFMT.[30]

Unlike the organizational structure in *Dainippon*, CCI appears to be a grandparent corporation to the Kansas subsidiaries and a parent corporation to CoxCom.  It is not merely a patent holding company, but also provides administrative, technical, and legal support to its indirect

---

[27]142 F.3d 1266, 1271 (Fed. Cir. 1998).

[28]*Id.* at 1271.

[29]*Id.*

[30]*Id.* (citations and footnotes omitted).

subsidiaries.[31]  There is no evidence in this case that CCI maintains any employees in Kansas, or that it collects any revenue from Kansas residents.

Merely providing legal representation and administrative services to a subsidiary will not subject a parent company to personal jurisdiction.[32]  Yet Sprint contends that CCI wields much more control than that over the Kansas subsidiaries.  The cases that consider the degree of control necessary for a parent corporation to be subject to jurisdiction based on the actions of its subsidiaries require "substantial control and direction of the subsidiary."[33]  In addition to support services, Sprint points to the McLeod declaration, which suggests CCI also controls the research, design, and development work to implement Cox's telephony system and that the affiliates merely provide local marketing, sales, installation and repair work in each local market.[34]  McLeod also asserts that "Cox's Digital Telephone service was developed and designed by Cox employees located at Cox's headquarters in Atlanta, Georgia"[35] and that "Cox coordinates the

---

[31]It is also dissimilar to the defendants' relationship in *WesternGeco L.L.C. v. Ion Geophysical Corp.*, 776 F. Supp. 2d 342 (S.D. Tex. 2011), which involved a collaborative relationship between sister companies and the nonresident defendant's sale, advertisement, and shipment of products to forum residents.  *Id.* at 355, 358–59.

[32]*See, e.g.*, *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 604 F. Supp. 2d 325, 330 (D. Mass. 2009) (finding common employees insufficient to establish minimum contacts and declining to pierce the corporate veil because evidence established a traditional parent-subsidiary relationship); *Ergo Licensing, LLC v. Cardinal Health, Inc.*, No. 08-259-P-S, 2009 WL 2021926, at *5 & n.3 (D. Maine July 13, 2009) (stating in patent case that merely providing legal representation and support functions to a subsidiary does not confer jurisdiction); *Hill-Rom Servs., Inc. v. Verses Tech., Inc.*, Nos. 1:03CV1227, 1:04CV1116, 2006 WL 1540851, at *8 (M.D.N.C. June 2, 2006) (distinguishing *Dainippon* on the basis that the parent company did not control the subsidiaries' activities nor did it oversee the manufacturing and distribution of an allegedly infringing product); *cf. QR Spex, Inc. v. Motorola, Inc.*, 507 F. Supp. 2d 650, 663 (E.D. Tex. 2007) (declining to find personal jurisdiction for parent company in patent case under alter ego theory, despite the fact that it provided oversight and marketing, owned 100% of the subsidiary's stock, and shared common officers).

[33]*Ablulimir v. U-Haul Co. of Kan.*, No. 11-4014-EFM, 2011 WL 2746094, at *3 (D. Kan. July 13, 2011); *Hill-Rom Servs., Inc.*, 2006 WL 1540851, at *7; *see also Dainippon*, 142 F.3d at 1271 (finding jurisdiction where holding company exerted control over its parent).

[34]Doc. 38, Ex. A-1 ¶ 5.

[35]*Id.* ¶ 6.

nationwide sale, marketing, and financial operations of the Cox Digital Telephone service."  CCI downplays the significance of these contributions, citing Sangston's testimony that the hub and spoke organization merely refers to the design and architecture of the telephone system.  The national support that CCI provides to its local affiliates amounts to network support, rather than any direct contact with the local fora.  Other than these back office functions, CCI contends it has no presence in Kansas—it owns no property or equipment, and does not maintain an office or any employees there.

The Court agrees with CCI that its relationship with the Kansas subsidiaries is insufficient to establish purposefully directed activity.  Sangston, who is the Vice President and Chief Compliance Officer for CCI, testified at length about Cox's corporate structure.  Her testimony established that CCI conducts no business directly in Kansas and that it merely provides "back office functions" for the local CoxCom subsidiaries.  She discussed Cox's history and structure and how it made a deliberate decision to form "drop down subsidiaries" to hold the telecommunications licenses in each state so that the parent corporations would not be engaged in the day-to-day operation of cable business.

Sprint points to CCI's activities of setting strategy, providing budget targets, "guiding local marketing and sales teams," providing network support, and purchasing equipment.  But the Court finds that Sangston's testimony, and the exhibits admitted through her testimony, establish that this control is insufficient to establish substantial control and direction.

While Sangston's testimony and the advertising exhibits demonstrate that some national marketing campaigns are made available to the local affiliates, the majority of marketing is conducted at the local level.  Sangston testified that Cox Communications Kansas has its own

16

marketing and sales team and that the marketing strategy differs among the Cox subsidiaries by locale based on the competitors in each market.  To the extent CCI is responsible for some national advertising campaigns, it is an insufficient minimum contact with the State of Kansas,[36] especially where, as here, CCI receives no Kansas revenue associated with this advertising.  And Sangston's testimony that CCI sets strategy and provides budget targets for the subsidiaries is consistent with her testimony that CCI merely provides back office functions, which the Court finds falls short of substantial control and direction.

Sangston's testimony about purchasing equipment made clear that CCI purchases equipment only under circumstances where a volume discount would be applied, allowing the subsidiaries to purchase their equipment from CCI instead of directly from the manufacturer. These purchases are charged back to the subsidiaries, so they are not purchased for use by CCI. And CCI's network support is not sufficient to establish substantial control.  Sangston testified that CCI employees maintain the NOC in order to provide support in situations that are national in scope.  Otherwise, support is provided at the local or regional level.  In short, the Court cannot find by a preponderance of the evidence that CCI exerts such substantial control over the Kansas subsidiaries that it should be subject to jurisdiction based on the subsidiaries' activities in Kansas.[37]

### b.  Website

Sprint relies on CCI's interactive website to establish purposeful direction, as well as

---

[36]*See Aero Prods. Int'l v. Intex Corp.*, No. 02-2590, 2002 WL 31109386, at *7 (N.D. Ill. Sept. 20, 2002).

[37]Sprint's reliance on *Payless Shoesource, Inc. v. Genfoot Inc.* is misplaced.  The defendants in *Payless* did not have an organizational relationship like the defendants in this case; it evaluated the defendant's product sales to its distributor under a traditional stream of commerce theory.  No. 02-4160-JAR, 2004 WL 2182184, at *4 (D. Kan. Sept. 21, 2004).

continuous and systematic contacts with Kansas.  Because CCI hosts the local subsidiaries'
interactive websites, Sprint argues that it directly targets each of the local markets in which those
subsidiaries operate.  CCI admittedly owns and hosts the cox.com website, where the Kansas
Defendants sell telephony products and services to Kansas customers.  The screen shots of these
web pages demonstrate that they are unmistakably interactive and transaction-oriented.  Kansas
customers can shop online for Cox digital telephone services on this website, which includes a
CCI copyright mark at the bottom of each web page.  Kansas customers can also pay their bills
online.  But the issue in this case is not whether the Kansas web pages located on the cox.com
site are interactive.  Instead, the issue is whether the interactivity of those web pages may be
attributed to CCI for jurisdictional purposes.  Sprint argues that CCI owns and controls the
website and therefore directly sells or offers to sell telephone services in Kansas by publishing
Kansas-specific content on its interactive website.  CCI argues that the local subsidiaries are
exclusively responsible for local web page content and that all Internet purchases are directed
toward those local subsidiaries; CCI's activities are akin to those of an Internet Service Provider
("ISP").

Some courts have adopted a sliding scale approach in deciding whether a defendant's
internet activities support the exercise of personal jurisdiction.[38]  The sliding scale approach
requires the Court to consider the website's level of interactivity in determining whether
personal jurisdiction lies.[39]  The Federal Circuit has acknowledged that some courts find the use

---

[38]*See Rainy Day Books, Inc. v. Rainy Day Books & Café, LLC.* 186 F. Supp. 2d 1158, 1163 (D. Kan. 2002)
(citing *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1296–97 (10th Cir.1999)).

[39]*Soma Med.*, 196 F.3d at 1296 (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119,
1123–24 (W.D. Pa.1997)).

of a "highly interactive, transaction-oriented website (as opposed to an 'essentially passive' website) by itself may support long-arm jurisdiction wherever the site is available to potential customers for the purpose of doing business."[40]  But neither the Federal Circuit nor the Tenth Circuit have adopted this approach.[41]  The Tenth Circuit has held that "maintenance of a web site does not in and of itself subject the owner or operator to personal jurisdiction, even for actions relating to the site, simply because it can be accessed by residents of the forum state."[42]  Acting as an ISP and merely providing bandwidth to a party transacting business with the forum state, is insufficient to establish purposeful availment.[43]  In the context of specific jurisdiction, there must be an indication that the defendant "deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state."[44]  For internet activity to establish general jurisdiction, there must be evidence that "'the defendant has actually and deliberately used its website to conduct commercial transactions on a sustained basis with a substantial number of residents of the forum.'"[45]

CCI established at the hearing that Cox Communications Kansas, and not CCI, is licensed to sell telephone services in Kansas.  Sprint points to Sangston's testimony about how a Kansas consumer navigates through the cox.com website—in order to reach the Kansas web

---

[40]*Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1281 (Fed. Cir. 2005) (contrasting this approach with the approach taken by some courts requiring "something more" beyond an interactive website).

[41]*See Trintec Indus., Inc.*, 395 F.3d at 1281; *Shrader v. Biddinger*, 633 F.3d 1235, 1242 n.5 (10th Cir. 2011).

[42]*Shrader*, 633 F.3d at 1241.

[43]*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714–15 (4th Cir. 2002).

[44]*Shrader*, 633 F.3d at 1241.

[45]*Id.* at 1243 (quoting *Smith v. Basin Park Hotel, Inc.*, 178 F. Supp. 2d 1224, 1235 (N.D. Okla. 2001)).

page, the consumer selects "Kansas" from the national map on the cox.com site and then clicks through to the products or services sought after.  Sprint contends that, in this way, CCI targets Kansas residents by directing those consumers to the Kansas web pages, thereby "doing business in Kansas."  But the Court finds this to be a tenuous assertion.  Sangston's testimony does not support Sprint's contention that CCI provides anything more than a platform, or template, upon which the Kansas subsidiaries conduct business with Kansas residents.  Only Cox Communications Kansas is licensed to sell telephone services in Kansas and Sangston established at the hearing that all requests for service are handled by the Kansas employees.  Indeed, Sangston testified that the cox.com website "is sort of, as I said, the template through which you access to the local information to make your purchasing decisions."[46]

Moreover, the bill payment process on the cox.com site supports Sangston's testimony that CCI itself does not interact with Kansas residents through the cox.com website.  Sangston testified that although CCI generates invoices for all customers, the payments are made to the Kansas affiliates.  Again, this testimony supports CCI's characterization that CCI merely provides back office functions to its indirect subsidiaries, including administrative activities such as generating bills through its database.

Sprint argued in its initial brief that CCI is a party to the service agreement available on the cox.com website for Kansas customers.  Sprint refers to the definition of "Cox," referenced in the first paragraph of the agreement: "Cox Communications and any Cox affiliate authorized to provide you with our services."  Sangston testified, however, that Cox Communications is a d/b/a/ for CoxCom.  CCI conducts no business and has no d/b/a/.  The Court finds that this

---

[46]Doc. 55, Hrg. Tr. at 85:21–24.

testimony makes clear that Kansas consumers do not enter into service agreements with CCI through the cox.com website.

It is undisputed that CCI provided its indirect subsidiaries, in Kansas and elsewhere, with the capability to transact business with Kansas residents.  But the evidence supports CCI's contention that CCI did not maintain the cox.com for the purpose of itself transacting business in Kansas.  Instead, it merely enabled the Kansas affiliates to sell the Cox products and services in the Kansas market and the Kansas consumers to pay their bills to the Kansas affiliates online.[47] The evidence shows that CCI was not responsible for the content of the local Kansas web pages, nor, as discussed below, did it collect revenue from the sales made by the Kansas subsidiaries.[48] The Court finds that CCI's role as the cox.com owner was merely passive; the interactivity of the website is attributable to the local subsidiaries' activities.  For this reason, the Court finds that the cox.com website does not establish contacts sufficient for general or specific jurisdiction in this case.

### c.      Revenue

Sprint alleges that CCI collects revenues from the sale of digital telephone products and services in Kansas.  Sprint relies on the Federal Circuit's decision in *Nuance Communications, Inc. v. Abbyy Software House* to support its position that when a holding company receives profits from the sale of infringing technology in the forum state, it satisfies the purposeful

---

[47]*See ALS Scan, Inc.*, 293 F.3d at 714–15.

[48]*See Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1281 (Fed. Cir. 2005) (discussing the importance of control over the website in determining personal jurisdiction); *CIVIX-DDI v. Microsoft Corp.*, 52 U.S.P.Q2d 1501, 1999 U.S. Dist. LEXIS 15230, at *14 (D. Colo. Sept. 30, 1999) (finding the subsidiary, and not the parent company, controlled or owned the web site in question and that parent must be viewed as "separate an autonomous entity").

direction prong.[49]  In that case, the Federal Circuit found that the defendant deliberately engaged in significant activities in the forum state because the co-defendants were commonly owned sister companies operating under consolidated management, the purported infringement occurred in the forum state, an agreement existed with the sister company to provide assistance in the allegedly infringing activity in the forum state, and 95% of the profits from the sale of allegedly infringing products flowed to the defendant.[50]

CCI conceded in its initial briefs that it receives profits from the sale of the allegedly infringing products in Kansas.  But at the hearing, it produced evidence that none of this revenue flowed up to CCI.  *Nuance* suggests that when the overwhelming majority of profits flow to the holding company, in addition to other deliberate activities in the forum state, it may be sufficient to show that the defendant purposefully directed its activities there.  There is no evidence in this case that an overwhelming majority of profits flow to CCI.  Instead, the consolidated tax returns establish no taxable income to CCI from Kansas.  Sprint attempts to impeach Sangston's testimony on this point with her deposition testimony that the subsidiaries' revenue is rolled up into a consolidated financial statement, but the Court does not find this testimony to be inconsistent.  When asked in her deposition if it was correct that CCI does not directly make money on the sale of Cox Digital Telephone to Kansas residents, she testified: "Correct." Sangston's testimony at her deposition and at the hearing consistently explained that all of the subsidiaries' revenue rolls up into a consolidated financial statement for accounting purposes so that the ultimate parent, Cox Enterprises, can have a "consolidated look."

---

[49]626 F.3d 1222, 1232–33 (Fed. Cir. 2010).

[50]*Id.* at 1232.

In sum, Sprint has presented no evidence upon which the Court could find by a preponderance of the evidence that CCI collects and retains revenue from the sale of digital telephone service in Kansas.  To the extent revenue flows through CCI, it is only in the form of a consolidated report.

### d.      Property and Taxes

Sprint points to Sedgwick County tax records that indicate CCI as the owner of equipment and land and that it is the payor of those taxes.  But the evidence presented at the hearing makes clear that this is but one more example of CCI's back office functionality—it issues the tax checks on behalf of the local subsidiaries and those amounts are then charged back.  Sangston's testimony, as well as the ledgers submitted at the hearing, support this finding.  Sprint asserts in its posthearing brief that "[w]hether or not the subsidiaries are subsequently billed for taxes paid by CCI is of no consequence."  But the Court finds that this fact is of consequence given Cox's organizational structure—this is one more function performed by CCI in its role of providing technical, legal, and administrative support services.  Sangston testified that the Sedgwick County tax statement submitted by Sprint pertains to an office building in Wichita, Kansas that CoxCom acquired in 2000, and that the owner's name on this statement is incorrect.  Exhibit 4, the warranty deed and title records, supports Sangston's testimony and confirms that Cox Communications Kansas currently owns the property.  The Court agrees that the tax forms signed by a CCI employee in the "owner signature block" were prepared by the County; the underlying documents show that the local subsidiary, not CCI, owns the property.

The Court finds that Sprint is unable to establish by a preponderance of the evidence that CCI has contacts with Kansas sufficient to give rise to specific or general jurisdiction.  To the

extent certain facts about Cox's organizational structure and ownership of certain property in Kansas was in question on the prehearing briefs, the Court finds that discovery and the evidentiary hearing clarified that CCI does not exert substantial control and direction over its indirect subsidiaries, does not conduct business through the cox.com website, and does not own property or pay taxes in Kansas.[51]   Accordingly, CCI has not purposefully directed its activities to residents of Kansas and does not have continuous and systematic contacts with Kansas.

### 2.       Arising out of or Relating to the Patent Infringement Claims

Sprint asserts direct patent infringement claims in the Amended Complaint, that "some act of making, using, offering to sell, selling, or importing products or services by the defendant constitutes an infringement of the presumptively valid patent named in the suit."[52]   Therefore, the patent infringement claims in this case must "arise out of and relate to the defendant's alleged manufacturing, using, or selling of the claimed invention" in order to establish specific jurisdiction.[53]   CCI maintains that even assuming it has purposefully directed activities to the State of Kansas, none of the ties to Kansas cited by Sprint arise out of or relate to the patent infringement claims.   Sprint points to the sales made through the cox.com website owned by CCI and the equipment owned by CCI with which it "makes and uses" Sprint's patents.

As described above, the evidence shows that CCI conducts no business in the State of

---

[51]At the hearing, Sprint complained that CCI has taken inconsistent positions on some of the jurisdictional facts and asks the Court to impose judicial estoppel on this basis.  Judicial estoppel requires proof that a party "succeeded in persuading a court to accept that party's former position, 'so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.'"  *Eastman v. Union Pac. R.R.*, 493 F.3d 1151, 1156 (10th Cir. 2007).  CCI did not succeed in persuading this Court to accept any former, inconsistent position it may have taken in the prehearing briefs, so this doctrine is inapplicable under the circumstances of this case.

[52]*Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1332 (Fed. Cir. 2008) (citing 35 U.S.C. § 271(a)).

[53]*Id.*

Kansas.  It is not licensed to sell digital telephone service and exists only as a back office headquarters for its indirect subsidiaries.  None of these back office functions arise out of or relate to the direct infringement claims asserted in this case.  For this additional reason, the Court finds that Sprint cannot establish that this Court has jurisdiction over CCI.

## III.   Venue

In this district, the standards for deciding a motion to dismiss under Rule 12(b)(3) for improper venue are generally the same as those for deciding a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.[54]  Because the Court finds no personal jurisdiction over CCI, the Rule 12(b)(3) motion is moot.

## IV.   Motion to Transfer

The Court now must determine whether to dismiss CCI or grant Defendants' motion to transfer this matter to the District of Delaware, where both personal jurisdiction and venue are proper.[55]  Under 28 U.S.C. § 1404(a): "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  In deciding a motion to transfer in the Tenth Circuit,[56] the Court is to weigh the following discretionary factors:

> the plaintiff's choice of forum; the accessibility of witnesses and
> other sources of proof, including the availability of compulsory
> process to insure attendance of witnesses; the cost of making the

---

[54]*Mohr v. Margolis, Ainsworth & Kinlaw Consulting, Inc.*, 434 F. Supp. 2d 1051, 1057–58 (D. Kan. 2006).

[55]*See* 28 U.S.C. § 1406; *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466–67 (1962).

[56]The law of the regional circuit applies to motions to transfer under § 1404(a).  *See In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1223 (Fed. Cir. 2011).

> necessary proof; questions as to the enforceability of a judgment if
> one is obtained; relative advantages and obstacles to a fair trial;
> difficulties that may arise from congested dockets; the possibility
> of the existence of questions arising in the area of conflict of laws;
> the advantage of having a local court determine questions of local
> law; and[ ] all other considerations of a practical nature that make
> a trial easy, expeditious and economical.[57]

The burden of proving that the existing forum is inconvenient lies with the moving party.[58]

The parties do not dispute whether this action "might have been brought" in Delaware. All parties are incorporated in Delaware and Sprint does not dispute that it could have filed this patent infringement suit in Delaware. Instead, the Court's inquiry turns on the convenience of the parties, guided by the relevant factors provided by the Tenth Circuit. "Merely shifting the inconvenience from one side to the other, however, obviously is not a permissible justification for a change of venue."[59]

### A.      Plaintiff's Choice of Forum

"'[U]nless the balance is strongly in favor of the movant[,] the plaintiff's choice of forum should rarely be disturbed.'"[60] Courts may give this factor less weight where the plaintiff does not reside in the forum, or whether the facts giving rise to the actions are not related or connected to the forum.[61] The Court finds this factor weighs against transfer. Sprint resides in Kansas and the facts giving rise to this patent lawsuit are related to Kansas—Sprint alleges that

---

[57]*Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1167 (10th Cir. 2010) (quoting *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991)).

[58]*Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir. 1992) (citing *Chrysler Credit Corp.*, 928 F.2d at 1515).

[59]*Emp'rs Mut. Cas. Co.*, 618 F.3d at 1167.

[60]*Id.* (quoting *Scheidt*, 956 F.2d at 965).

[61]*Id.*

the remaining defendants make, use, offer to sell, and sell products and services in Kansas that infringe Sprint's patents.  The Court finds that Plaintiff's choice of forum in Kansas should not be disturbed unless the balance of the remaining factors is strongly in favor of transfer.

Defendants suggest that Sprint's incorporation in Delaware should weigh in favor of transfer.  But the cases on which Defendants rely are inapposite.  They deal with the significance of a party's state of incorporation for purposes of either a personal jurisdiction analysis,[62] or transfer motions that are denied because the moving party fails to establish inconvenience.  This latter group of cases all give weight to the plaintiff's choice of forum—a choice that is often based on the plaintiff's state of incorporation.[63]  These cases do not support Defendants' argument here, which is in reverse: the case should be transferred to Delaware because all parties are incorporated there, notwithstanding Sprint's residence in Kansas, the fact that the claims arose in Kansas, and that Sprint's choice of forum under such circumstances should be given weight.  Defendants' reliance on the parties' state of incorporation in Delaware fails to acknowledge that the burden of proof to show inconvenience is on Defendants, not on Sprint.  However, while Sprint's incorporation in Delaware does not negate the weight accorded its choice of forum in Kansas, this fact will be considered below in determining whether transfer is in the best interest of judicial economy given that Delaware is the forum where all of the Cox

---

[62]*J. McIntyre Mach., Ltd. v. Micastro*, 131 S. Ct. 2780, 2787 (2011).

[63]*E.g., Mallinckrodt, Inc. v. E-Z-Em Inc.*, 670 F. Supp. 2d 349, 356–57 (D. Del. 2009) (denying transfer motion in part because the plaintiff's decision to bring suit in Delaware should not be disturbed and the defendants' incorporation in Delaware makes it difficult to argue for transfer to its preferred choice of venue); *Praxair, Inc. v. ATMI, Inc.*, No. Civ. 03-1158-SLR, 2004 WL 883395, at * (D. Del. Apr. 20, 2004) (denying motion to transfer, finding plaintiff's choice of forum should be honored, especially in light of the fact that Delaware is "both parties' 'home turf'"); *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, 797 F. Supp. 2d 472, 481–82 (D. Del. 2011); *cf. BOC Grp. v. CVC Prods., Inc.*, No. Civ. A. No. 87-354-CMW, 1998 WL 62593, at *1–2 (D. Del. June 6, 1988) (granting motion to transfer where the defendant established that litigating in Delaware would cause it financial hardship despite the fact that both parties were incorporated in Delaware).

entities may be sued.

**B.     Accessibility of Witnesses and Sources and Cost of Proof**

In considering the accessibility factor, "convenience of witnesses is the most important factor in deciding a motion under § 1404(a)."[64]  Ease of access to documents is not usually as important in patent infringement cases.[65]  To show inconvenience for witnesses, the movant must: "(1) identify the witnesses and their locations; (2) 'indicate the quality or materiality of the[ir] testimony;' and (3) 'show[ ] that any such witnesses were unwilling to come to trial . . . [,] that deposition testimony would be unsatisfactory[,] or that the use of compulsory process would be necessary.'"[66]

Sprint has submitted evidence of its anticipated witnesses, most of whom are located in the Kansas City metropolitan area.  It has also submitted evidence that its documents related to the asserted patents are located in Overland Park, Kansas.  Defendants argue that their documents and witnesses are spread across the country, and point out that Sprint's principal inventor is deceased and that much of the evidence is housed at the Patent and Trademark Office in Washington, D.C., or with the Cox entities.  But Defendants submit no evidence about the potential witnesses who will be required to testify in this matter, whether they are subject to compulsory process or whether their deposition testimony will be adequate.  Conclusory assertions are insufficient.[67]  Neither party submitted any evidence about the cost of proof,

---

[64]

[65]*See Nat'l Inst. for Strategic Tech. Acquisition & Commercialization v. Nissan N.A., Inc.*, No. 10-1346-SAC, 2011 WL 915392, at *3 (D. Kan. Mar. 15, 2011).

[66]*Emp'rs Mut. Cas. Co.*, 618 F.3d at 1169.

[67]*Id.*

although the evidence submitted by Sprint makes clear that it would be less costly for it to litigate this matter in Kansas given how many witnesses are located here.[68]

The Court find these factors weigh against transfer, but notes that some of the witnesses Sprint has identified are Sprint employees, not third-party witnesses, and that Sprint has not established the "quality or materiality" of their anticipated testimony.  The Court does not find that this factor strongly weighs against transfer on this record.

### C.      Enforceability of Judgment

As to this factor, the parties dispute whether this Court can enforce a judgment against CCI, for the same reasons set forth in the motion to dismiss.  Because the Court lacks personal jurisdiction over CCI, it may not enforce a judgment against it.  Because Delaware can enforce a judgment against CCI, this factor weighs strongly in favor of transfer.

### D.      Difficulties that May Arise from Congested Dockets

In considering this factor, "the most relevant statistics are the median time from filing to disposition, median time from filing to trial, pending cases per judge, and average weighted filings per judge."[69]  These statistics show a less congested docket in Kansas as compared to Delaware.[70]  Additionally, Sprint points out that this district has experience with the particular

---

[68]Defendants mistakenly compare the burden of air travel for trial in this case as between the Philadelphia airport, twenty miles from the Delaware court, and Wichita, Kansas.  This matter was filed in the Kansas City, Kansas division and Sprint has designated Kansas City as the place for trial.  *See* Doc. 35 at 17; Doc. 26 at 22.

[69]*Emp'rs Mut. Cas. Co.*, 618 F.3d at 1169 (citations omitted).

[70]Measured by weighted filings, Delaware has a substantially higher number of average weighted filings per judge.  *See* Adminstrative Office of the United States Courts, Federal Court Management Statistics, *available at* http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics/DistrictCourtsSep2011.aspx (Sept. 2011).

patents and underlying technology at issue in this case based on prior litigation.[71]  And there are

three related lawsuits pending in this district regarding the same patents and technology.[72]  The

undersigned denied without prejudice Sprint's motion to consolidate this case with the other

three based on the pending motions at issue in this case that were not at issue in those cases.  The

Court expects that these cases will likely be consolidated upon resolution of these motions, at

least for discovery.

The Court does not find that the existence of related cases standing alone weighs in favor

of transfer, as these cases will all be appealed to the Federal Circuit, ensuring against

inconsistent adjudications of the same patents.[73]  And the mere existence of a Court's prior

experience with cases construing the same patents should not tip the balance in favor of denying

transfer.[74]  Finally, the statistical evidence does not evidence how quickly patent cases proceed to

trial in either district—Cox correctly notes that the *Vonage* case was pending for about two years

before it proceeded to trial.  For all of these reasons, the Court finds that this factor is neutral.

The parties appear to agree that there are no issues here implicating conflict of laws or

facts that would make it advantageous for this Court to determine questions of local law.  And

the Court is unable to find on this record any obstacle to a fair trial in either venue.  So the  Court

---

[71]*Sprint Comm'cns Co. v. Big River Tele. Co.*, Case No. 08-2046-JWL-JPO (D. Kan.); *Sprint Comm'cns Co. v. Vonage Holdings Corp.*, Case No. 05-2433-JWL.

[72] Case Nos. 11-2684-KHV, 11-2685-RDR, and 11-2686-JTM.  *See Trading Techs. Int'l, Inc. v. CQG, Inc.*, No. 05 C 4811, 2005 WL 3601936, at *4 (Oct. 31, 2005) (acknowledging efficiency benefit of retaining related cases in one venue).

[73]*See e.g*, *Pergo, Inc. v. Alloc, Inc.*, 262 F. Supp. 2d 122, 133 (S.D.N.Y. 2003).

[74]*See In re Verizon Bus. Network Servs. Inc.*, 635 F.3d 559, 562 (Fed. Cir. 2011) (discussing *In re Vistaprint Ltd.*, 628 F.3d 1342, 1347 n.3 (Fed. Cir. 2010)) (acknowledging that although a court's extensive analysis that its familiarity with an asserted patent pertaining to the same technology based on prior litigation warrants denial of transfer may not be an abuse of discretion, "it does not mean that, once a patent is litigated in a particular venue the patent owner will necessarily have a free pass to maintain all future litigation involving that patent in that venue.").

proceeds to consider issues of judicial economy.

**E.      Judicial Economy**

Defendants argue that this case should be transferred to Delaware and consolidated with the declaratory judgment action filed there in April 2012, on behalf of themselves and all of the other Cox entities, including CCI, in order to avoid piecemeal litigation against the various Cox entities.[75]  Defendants rely on e-mail correspondence between counsel that display Sprint's desire to seek relief for patent infringement by Cox entities both in the State of Kansas and elsewhere, as well as against CCI.  As such, Defendants assert that Delaware is the only forum where all parties can be sued since they are all incorporated there.

The Court declines to make a determination about whether the additional parties named in the Delaware action are necessary or indispensable, as that is not an inquiry properly before the Court on this motion to transfer.  But the fact that Sprint named CCI in this case suggests it considers CCI necessary to obtain complete relief.  Sprint also suggests in the e-mails attached to the briefs that these other entities may be subject to suit given that the patent infringement claims concern patents that are used on the entire Cox network.  The Court finds that the Court's interest in avoiding duplicative and piecemeal litigation strongly favors transfer of this matter to Delaware where all parties, including CCI may be sued.

In sum, the Court finds that the balance of convenience factors strongly favor Defendants' request for transfer of this matter to Delaware, such that Sprint's choice of forum in Kansas properly may be disturbed.  Rather than dismiss this case against CCI based on lack of personal jurisdiction, the Court will transfer the matter under 28 U.S.C. § 1404(a).

---

[75]The Cox Defendants also assert patent infringement claims against Sprint in that action.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Cox Communications Inc.'s Motion to Dismiss under Rule 12(b)(2) and 12(b)(3) for Lack of Personal Jurisdiction and Improper Venue (Doc. 31) is **denied**.

**IT IS FURTHER ORDERED** that and Defendants' Motion to Transfer (Doc. 33) is **granted**.  The Clerk is directed to transfer this case to the United States District Court for the District of Delaware.

**IT IS FURTHER ORDERED** that Defendant Cox Communications, Inc. and Cox Communications Kansas, LLC's motions to dismiss the original complaint (Docs. 18 and 20) are **denied as moot**.

Dated: September 14, 2012

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE